IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**RICHARD D. COGSWELL, JR., for**
*Laura M. Cogswell, Deceased*

Case No. 3:16 CV 2030

Plaintiff,

Judge Jeffrey J. Helmick

v.

Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

Defendant.

REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Richard D. Cogswell, Jr. ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of his deceased mother, Laura M. Cogswell ("Ms. Cogswell")[1], seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 16, 2016). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Ms. Cogswell filed for, and was granted, DIB beginning on August 3, 1997. (Tr. 917). A subsequent continuing disability review, however, found she was no longer disabled as of October 1, 2007. (Tr. 36-53). *See* 42 U.S.C. § 421(i); 20 C.F.R. §§ 404.1590(a), 404.1594. She appealed

---

1. The claimant, Ms. Cogswell, died on January 12, 2015, and her son was substituted as a party. (Tr. 917, 1027).

that decision, and an administrative law judge ("ALJ") held a hearing in May 2009. (Tr. 54-71, 76-86, 821). Following the hearing, in a written decision dated June 12, 2009, the ALJ affirmed Ms. Cogswell was no longer disabled as October 1, 2007. (Tr. 481-90). In July 2010, the Appeals Council vacated the ALJ's decision and ordered the reopening of a subsequent determination made on March 25, 2010, regarding a subsequent benefits claim. (Tr. 497-509). In July 2010, the Appeals Council consolidated and remanded both claims to another ALJ for further proceedings. *Id.* Hearings were held in December 2010 (Tr. 510-15) and November 2011 (Tr. 699-704).

On January 10, 2012, the ALJ issued an unfavorable decision. (Tr. 11-35). Ms. Cogswell filed a complaint in this Court, which remanded the case to the agency. (Tr. 951-99) (*Cogswell v. Comm'r of Soc. Sec.*, Case No. 13CV689 (N.D. Ohio)). The Appeals Council issued a remand order in February 2015. (Tr. 951-52). A hearing was held on November 19, 2015. (Tr. 1737-48, 1758-77). On December 23, 2015, the ALJ issued an unfavorable decision finding Ms. Cogswell's disability ended as of October 1, 2007, and that she was not under a disability from that date through the date last insured of December 31, 2012. (Tr. 914-39). On June 16, 2016, the Appeals Council denied Plaintiff's request for review, making the December 23, 2015 decision the final decision of the Commissioner. (Tr. 908-13). *See* 20 C.F.R. § 404.984(b)(2). 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on August 14, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational Background

Ms. Cogswell was born in 1964 (Tr. 938) and passed away in 2015 (Tr. 917, 1027). She was 48 years old on her date last insured, December 31, 2012.[2] (Tr. 918). *Id.* She had prior work experience as a press operator and production worker. (Tr. 62).

Medical Evidence

In March 2009, neurologist Richard A. Dirrenberger, M.D., evaluated Ms. Cogswell for complaints of numbness and headaches. (Tr. 463-66). Ms. Cogswell stated the numbness began approximately ten years prior and had progressively worsened over the years. (Tr. 463). Dr. Dirrenberger stated the etiology of Ms. Cogswell's numbness was unclear, and that she did not have any abnormality in her cervical spine which explained her symptomatology. (Tr. 466). He ordered further imaging studies. *Id.*

After going to the emergency room, Ms. Cogswell saw Keith Baker, M.D., on July 21, 2009, for left arm pain and left facial numbness. (Tr. 582-86). Dr. Baker determined she had "[r]ather atypical symptomatology and negative CT for some neurologic symptoms that seem longer than one would expect for a [transient ischemic attack] which was our ER admitting diagnosis." (Tr. 584). He prescribed aspirin, but "d[id] not think it would be necessary to add Plavix or Persantine to the aspirin at this time", and recommend she follow up as an outpatient. *Id.*

Neurologist Peter P. Zangara, M.D., evaluated Ms. Cogswell on August 25, 2009. (Tr. 661-64). A physical examination revealed she had overall intact deep tendon reflexes; overall intact sensation except for a slight reduction in pin, touch and vibration over right limbs and digits;

---

2. To be eligible for DIB, a claimant must be "under a disability" as of the date her insured status expired. 42 U.S.C. § 416(i); 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

normal heel and toe walking; normal coordination; reduced sensation over right side; normal motor examination; and normal strength. (Tr. 662-63). Dr. Zangara noted Ms. Cogswell had a normal gait, and "trie[d] to limp on the right but not very convincing" (Tr. 662). Dr. Zangara also noted that she had "done very well from her kidney standpoint" but noticed a progressive, right-sided numbness and a sense of weakness. (Tr. 663). Dr. Zangara concluded Ms. Cogswell "amplifie[d]" her symptoms, and did not have a neurological diagnosis. (Tr. 664). He noted her symptoms may be related to anxiety disorder. *Id.*

In September 2009, Ms. Cogswell saw nephrologist Balhinder Brar, M.D. (Tr. 678-81). The treatment records reveal Ms. Cogswell had stable renal function and was "tolerating her immunosuppression from the CellCept and Neoral well." (Tr. 679). His impression was: 1) "Recurrent TIAs based on both the symptoms of weakness in her extremities and sensory symptoms of paresthesis without any overt MRI or MRA findings. MRA of the carotid arteries did not show any evidence of carotid stenosis. The possibility of embolic phenomena is being looked into by Dr. Lal in Indiana. Hypocoaguable work-up has been initiated."; 2) "Loss of grip strength in both hands."; 3) "Status-post decreased donor transplant with stable graft function."; and 4) "Density of the anterior surface of the mitral valve of unclear etiology. Work-up is in progress." (Tr. 680).

Ms. Cogswell saw Dr. Brar again on February 3, 2010, and continued to complain of right upper extremity weakness and loss of grip strength in her right hand. (Tr. 674). Ms. Cogswell also reported dizziness, lightheadedness, and nausea. *Id.* Dr. Brar noted that Dr. Zangara's examination revealed no "overt focal deficits", and her diagnostic work-up came back unremarkable. *Id.* A physical examination showed some muscle weakness on the right side. (Tr. 675). Dr. Brar noted

Ms. Cogswell showed "evidence of wasting" and recommended additional diagnostic tests. (Tr. 675-76).

At a follow-up visit on May 12, 2010, Dr. Brar noted Ms. Cogswell's stable renal function and tolerance of immunosuppression treatment. (Tr. 757-59). Dr. Brar noted Ms. Cogswell had right upper and lower extremity weakness of unclear etiology, but appearing "consistent with an ischemic, degenerative, and infective central process." (Tr. 759). He added that a psychosomatic disorder could not be ruled out. *Id.*

Dr. Zangara evaluated Ms. Cogswell again in March 2010, and noted examination findings similar to his first evaluation. (Tr. 657-60). Diagnostic testing he previously ordered for a stroke risk work-up, was negative (Tr. 659, 668, 674, 694). Dr. Zangara concluded Ms. Cogswell's symptoms were likely "anxiety induced"; he recommended she undergo a psychiatric consultation. (Tr. 659). Dr. Zangara saw "no role for any further neurologic testing or need to return for re-evaluation." *Id.*

At a follow-up appointment in September 2010 with Dr. Brar, Ms. Cogswell complained of diarrhea, stomach cramping, vertigo when walking, "some problems with balance", and occasional headaches. (Tr. 754). Dr. Brar's impression was: 1) infectious diarrhea due to immunosuppression; 2) peripheral neuropathy "likely from degenerative joint disease. The possibility of proximal myopathy from steroids is being considered as well"; 3) vertigo "of unclear etiology"; and 4) "Status-post decreased donor transplant with good graft function." (Tr. 755).

A few months later, in December 2010, Dr. Brar noted "[s]teroid induced myopathy was being considered, however the symptoms are lateralized to the right side and makes it unlikely." (Tr. 749). Dr. Brar noted Ms. Cogswell's right extremity weakness with paresthesias and numbness

was not substantiated by imaging abnormalities, and that while "white matter disease was being considered", "the MRI did not confirm that." (Tr. 751).

Ms. Cogswell saw Dr. Brar again in March 2011. (Tr. 746-48). His impression was: 1) "Status-post deceased donor transplant with excellent graft function. Renal function is stable."; 2) ride side weakness of unclear etiology; and 3) "Recurrent migraines on non-steroidal anti-inflammatory drugs, which she uses sparingly, maybe once a week." (Tr. 748).

From December 2010 through April 2011, Mark G. Loomus, M.D., saw Ms. Cogswell for neck and right shoulder pain, and complaints of weakness. (Tr. 725-38). Physical examinations showed normal motor strength and no "obvious" weakness present in the muscle groups; normal gait and station; normal muscle tone; "collapse weakness" of the right side; and some limited range of motion of the right shoulder without pain (Tr. 729, 732-33, 737). Ms. Cogswell also had intact neurological and sensory examination, except for diminished pinprick on the right side; normal coordination; and intact deep tendon reflexes (Tr. 729, 733, 737). Dr. Loomus believed Ms. Cogswell's marked sleep deprivation was causing "her mind to 'exaggerate' or embellish some of the symptoms." (Tr. 738), *see also* Tr. 735. He recommended diagnostic testing (Tr. 730, 734). A cervical MRI revealed "[s]pondylosis and disk protrusions, greatest at the C5-C6 and C6-C7 levens." (Tr. 743-44). An EMG of the right upper extremity demonstrated "[n]o evidence of right cervical radiculopathy." (Tr. 725).

Ms. Cogswell saw C. Daniel Ansevin, M.D., in July and August 2011, for complaints of numbness and tingling. (Tr. 791-804). A neurological examination was unremarkable and demonstrated no limb weakness, and normal motor, reflexes, sensation, coordination, and gait. (Tr. 793, 800). An MRI of the brain revealed a T2 abnormality, but the "[f]indings [were] nonspecific and may represent demyelinating preprocess or sequela of inflammatory or infectious

6

process." (Tr. 782), *see also* 793, 800. Dr. Ansevin reviewed the results of the MRI, but did not find any lesion to explain Ms. Cogswell's complaints, and noted the physical examination was unremarkable. (Tr. 794, 801).

In September 2012, Edward Goldberger, M.D., noted Ms. Cogswell's "number of neurological investigations that have been inconclusive" and stated: "I believe she basically has fibromyalgia . . . ". (Tr. 1088).

Opinion Evidence

*Dr. Brar's Letter*

On February 26, 2009, Dr. Brar wrote a letter "To Whom It May Concern" in support of Ms. Cogswell's application for benefits. (Tr. 496). In it, he stated:

> This letter is being written in support of [Ms.] Cogswell's application for social security benefits. I am [Ms. Cogswell]'s transplant nephrologist and have been following her for the last four years or so for post [-] transplant nephrology care. She has a known history of end-stage renal disease secondary to IgA nephropathy and underwent a decreased donor renal transplant in 1998. She has maintained a good graft function and is currently being maintained on immunosuppressive medications. Unfortunately, because of her immunosuppressive medications including corticosteroids and end-stage renal disease, she has developed disabling musculoskeletal symptoms involving her upper and lower extremities. These symptoms include weakness and paresthesis, which have incapacitated her and are affecting her activities of daily living. Her work-up for these symptoms is being planned through her primary care physician, Dr. Mattox. Due to the above symptoms, she is unable to hold on to any vocation and is relying on social security for benefits to cover the cost of post [-] transplant nephrology care. She also continues to need her immunosuppressive medications. Any help from social security would be welcome and necessary.

*Id.*

*State Agency Reviewers' Opinions*

On January 7, 2008, state agency reviewing physician Teresita Cruz, M.D., noted that Ms. Cogswell was granted disability in 1998 due to chronic renal failure and a kidney transplant. (Tr. 259). Dr. Cruz stated that benefits ceased in October 2007 due to a significant medical

improvement involving Ms. Cogswell's creatinine number. *Id.* She added that despite chronic steroid use, there was no evidence of osteoporosis, and imaging studies showed no kidney reflux. *Id.*

On November 5, 2009, a second state agency reviewing physician, Lynne Torello, M.D., determined Ms. Cogswell could: lift or carry twenty pounds occasionally and ten pounds frequently; sit about six hours in an eight-hour workday; stand and/or walk at least two hours in an eight-hour workday; occasionally reach, handle, and finger on the right side; occasionally perform postural activities except she could not climb ladders, ropes or scaffolds; and must avoid moderate exposure to hazards. (Tr. 1014-21).

Hearing Testimony

A vocational expert ("VE") testified at the November 19, 2015 hearing. (Tr. 1764-74). The ALJ presented the VE with a hypothetical individual of Ms. Cogswell's age, education, and work background who could perform the functions of light work except that she was limited to: occasional climbing of stairs; no climbing of ladders; no balancing on one lower extremity at a time; occasional kneeling and crouching; rare exposure to temperature extremes; occasional exposure to humidity and respiratory irritants; no exposure to obvious hazards; performance of work that could be done in a seated or standing position; and could understand, carry out, and remember simple instructions where the pace of productivity was not dictated by an external source over which she has no control; make judgments on simple work; respond appropriately to usual work situations and changes in a routine work setting; respond appropriately to supervision, the general public, and coworkers; and have occasional exposure to coworkers and rare exposure to the general public. (Tr. 1766-67).

The VE determined the individual would be unable to perform Ms. Cogswell's past work of Wiring Harness Assembler, but could perform other work in the national economy, such as Office Helper, Photocopy Machine Operator, and a limited number of Merchandise Markers positions. (Tr. 1766-68). He added that an individual with the same limitations, but also limited to sedentary work, could perform the occupations of Address Clerk, Document Preparer, and Table worker. (Tr. 1768-69). The VE also opined that adding frequent handing and fingering to the hypothetical would not change his response. (Tr. 1769).

Plaintiff did not testify on behalf of his deceased mother, Ms. Cogswell. (Tr. 1763-64).

ALJ Decision

On December 23, 2015, the ALJ issued an unfavorable written decision, making the following findings of fact and conclusions of law:

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated January 18, 1998. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairment: chronic renal failure. This impairment was found to meet section(s) 6.02A of [the listings].

3. Through October 1, 2007, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity, nor did the claimant engage in substantial gainful activity through her date last insured of December 31, 2012.

4. The medical evidence establishes that, as of October 1, 2007, the date the claimant's disability ended, through December 31, 2012, the date the claimant was last insured, claimant had the following *medically determinable impairments*: status post remote renal transplant, fibromyalgia, degenerative joint disease at C5-6, hyperlipidemia, allergies, migraine headaches, minimal disc bulge at L5-S1, right carpal tunnel syndrome, hypertension, history of remote transient ischemic accident (TIA) / coronary vascular accident (CVA), coronary artery disease, and basal cell carcinoma / squamous cell carcinoma on the face.

5. From October 1, 2007, through the claimant's date last insured of December 31, 2012, the claimant did not have an impairment or combination of

9

impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

6. Medical improvement occurred as of October 1, 2007.

7. The medical improvement is related to the ability to work because, as of October 1, 2007, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD.

8. From October 1, 2007 through the date last insured of December 31, 2012, the claimant continued to have a severe impairment or combination of impairments.

9. Based on the impairments present as of October 1, 2007 and continuing through the date last insured of December 31, 2012, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: work that can be done in a seated or standing position; occasional climbing stairs, kneeling, and crouching; no balancing on one lower extremity at a time or climbing ladders and the like; rare (meaning less than occasionally but not completely precluded) exposure to temperature extremes; occasional exposure to humidity and respiratory irritants; and no exposure to obvious hazards. The claimant could also: understand, carry out and remember simple instructions where the pace of productivity is not dictated by an external source over which the claimant would have no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting; and respond appropriately to supervision, the general public, and coworkers, but due to side effects of immunosuppressive drug therapy, exposure to the general public should be rare and occasional to coworkers.

10. As of October 1, 2007, the claimant was unable to perform past relevant work.

11. On October 1, 2007, the claimant was a younger individual age 18-49.

12. The claimant had at least a high school education and is able to communicate in English.

13. Beginning on October 1, 2007, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant had transferable job skills.

14. As of October 1, 2007, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of October 1, 2007, the claimant was able to perform a significant number of jobs in the national economy.

10

15. The claimant's disability ended as of October 1, 2007.

(Tr. 914-39) (internal citations and footnote omitted).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR CONTINUING DISABILITY[3]

After the Commissioner finds a claimant disabled, she conducts periodic reviews of the claimant's condition to determine if the claimant continues to be disabled. 42 U.S.C. § 421(i); 20 C.F.R. § 404.1594. A claimant may no longer be found disabled if she experiences medical improvement, defined by the regulations as "any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled or

---

3. The undersigned agrees with the Commissioner that the eight-step standard for evaluation continuing disability applies here, rather than the five-step standard for evaluating disability determinations in the first instance.

continued to be disabled and is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(c)(1).

The Commissioner employs an eight-step sequential analysis when determining whether a claimant continues to be disabled. 20 C.F.R. § 404.1594(f). At the first step, the Commissioner considers whether the claimant is performing substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If the claimant is not, the Commissioner proceeds to step two and determines whether the claimant has any severe impairments, singly or in combination, that meet or medically equal an impairment listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1594(f)(2). If the claimant's severe impairments do not meet or medically equal a listing, the analysis proceeds to step three, where the Commissioner determines whether there has been any medical improvement in the claimant's condition since the disability finding. 20 C.F.R. § 404.1594(f)(3). If the Commissioner finds that there has been medical improvement, she then determines at step four if that medical improvement is related to the claimant's ability to work. 20 C.F.R. § 404.1594(f)(4). If the claimant has not experienced medical improvement, or if that medical improvement is not related to the claimant's ability to work, then, at step five of the process, the Commissioner considers whether any exception applies; if not, benefits continue. 20 C.F.R. § 404.1594(f)(5). If there is work-related medical improvement, or if an exception applies at step five, then the Commissioner proceeds to step six, and considers whether all of the claimant's then-current impairments are severe. 20 C.F.R. § 404.1594(f)(6). If so, at step seven, the Commissioner assesses the claimant's residual functional capacity (RFC), and whether that RFC allows the claimant to perform past work. 20 C.F.R. § 404.1594(f)(7). If the claimant's RFC allows the claimant to perform past work, then the claimant is no longer disabled. *Id.* If it does not, the

12

Commissioner proceeds to the final step, and considers whether the claimant's RFC, age, education, and past work experience allow her to perform other work in the economy. 20 C.F.R. § 404.1594(f)(8). If so, the claimant is no longer disabled. *Id.*

**DISCUSSION**

Plaintiff alleges the ALJ erred in two ways: 1) in her analysis of the medical opinion evidence; and 2) in failing to adequately consider the entire record. The Commissioner responds the ALJ appropriately weighed the medical source evidence and the decision is supported by substantial evidence.

<u>Medical Opinion Evidence</u>

Medical opinions are evaluated under the factors set forth in 20 C.F.R. § 404.1527(c). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). Opinions from medical sources who have examined claimants are given more weight than sources who have not performed examinations ("nonexamining sources"). 20 C.F.R. § 404.1527(c)(1). Opinions from medical sources who regularly treat the claimants ("treating sources") are afforded more weight than those from sources who have examined the claimant but do not have an ongoing treatment relationship ("nontreating sources"). 20 C.F.R. § 404.1527(c)(2). In conjunction, the ALJ considers the supportability, consistency, and specialization of the physician. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); 20 C.F.R. § 404.1527(c)(3)-(6). "In other words, 'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2).

When evaluating any medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R.

13

§ 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

*State Agency Reviewers*

Plaintiff first briefly argues the ALJ erred by implicitly, rather than explicitly, relying on the state agency reviewers' opinions whom he asserts did not have "the full view of the record that the ALJ and the treating physicians did." (Doc. 17, at 11). This argument is not well-taken. An ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that was developed post-dating those opinions); *Patterson v. Comm'r of Soc. Sec.*, 2017 WL 914272 at *10 (N.D. Ohio) ("ALJ may rely on a state agency reviewer who did not review the entire record, so . . . long as the ALJ also considers the evidence post-dating the opinion."); *Ruby v. Colvin*, 2015 WL 1000672, at *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion.").

Here, while the state agency reviewers' opinions are older because of the procedural posture of this case —January 2008 and November 2009— a review of the ALJ's decision shows she thoroughly reviewed the evidence of record, including evidence post-dating the opinions. *See generally*, Tr. 917-39. *See Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (finding no error in giving great weight to an earlier state agency reviewing physician opinion

when "the ALJ's own analysis clearly spanned the entire record"). Furthermore, state agency reviewing physicians are considered experts, and their opinions may, at times, be entitled to greater weight than treating or examining physicians when the opinions are supported by the evidence. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("State agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating . . . source.") (first alteration in original) (internal quotation marks omitted).

The ALJ, therefore, did not err in giving Dr. Cruz's opinion great weight, and partially adopting Dr. Torello's opinion. Furthermore, Plaintiff does not point to specific evidence the ALJ should have, but failed to, consider.[4]

*Treating Physicians*

Plaintiff next argues the ALJ erred in her analysis of opinions from treating physicians Drs. Zangara and Brar. In general, "greater deference is [] given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). "Treating-source opinions must be given controlling weight if two conditions are met: 1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques;' and 2) the opinion 'is not inconsistent with the other substantial evidence in the record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R.

---

4. Plaintiff waives underdeveloped arguments. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and internal quotation omitted); *see also Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) (court need not "broadly scrutinize" the entire record when plaintiff fails to cite specifics regarding an argument)

§ 404.1527(c)(2)). If the Commissioner does not assign controlling weight to a treating source opinion, "then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, [] as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The ALJ must give "good reasons" for the weight given to a treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (finding ALJ gave good reasons for discounting parts of a treating physician's opinion). "These reasons must be 'supported by the evidence in the case record.'" *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *5). For example, a good reason is if a treating source's opinion is inconsistent with the rest of the evidence. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

### Dr. Brar

The ALJ considered Dr. Brar's February 26, 2009 letter, but ultimately determined it was not a "medical opinion" requiring controlling weight. (Tr. 936). Even so, she considered the letter and thoroughly discussed it in relation to the entire record before ultimately assigning it "little weight". The undersigned finds she did not err in analyzing the letter.

First, the ALJ did not err in failing to give the letter controlling weight because it does not qualify as a "medical opinion" for purposes of the regulations, as it does not speak to Ms. Cogswell's functional limitations. Medical opinions are statements from physicians regarding the

severity of an individual's impairments and the most that individual can still do despite the impairments, including any potential restrictions. 20 C.F.R. §§ 404.1527(a), 416.927(a). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine you are disabled." §§ 404.1527(d), 416.927(d). Rather, these opinions are issues reserved to the Commissioner and an ALJ is not required to give these opinions controlling weight or special significance. *Id*. There is a difference between medical opinions and an RFC finding. The ALJ, not a medical source, is tasked with making the latter determination. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). The two assessments are not synonymous, and need not be identical to be compatible. SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment.").

Second, even though the letter was not a medical opinion, the ALJ still thoroughly analyzed it and provided sufficient reasons for assigning it "little weight". The ALJ found Dr. Brar's statements regarding Ms. Cogswell's musculoskeletal symptoms as they related to her immunosuppressive medication and renal disease unsupported by the record and inconsistent with his own treatment notes. (Tr. 936). The ALJ's findings are supported by substantial evidence in the record. For example, as the ALJ pointed out, in September 2009, Dr. Brar suggested Ms. Cogswell's weakness could be a result of recurrent TIAs, but he admitted there were no overt MRI or MRA findings. (Tr. 936) (citing Tr. 680). Also, Dr. Ansevin reviewed the results from a July 2011 MRI and noted that while there were some findings, they likely represented a remote microvascular infarct and did not explain her diffuse complaints. (Tr. 936) (citing Tr. 782-83, 793-94, 800-01). A May 12, 2010 treatment note from Dr. Brar, stated that while Ms. Cogswell's right

upper and lower extremity weakness was of unclear etiology, it was likely not due to myopathy or a systemic process like steroid induced muscle damage due to its unilateral nature. (Tr. 937) (citing Tr. 669-71). The ALJ concluded: "it does not appear from Dr. Brar's treatment notes that he could reasonably attribute the claimant's symptoms to her immunosuppressive therapy or end stage renal disease." (Tr. 937), *see* Tr. 671, 678-80. The ALJ added: "Persuasive contradictory evidence exists in that both Dr. Barr and Dr. Loomis have suggested the possibility of a psychosomatic origin for her complaints." (Tr. 937), *see* Tr. 671, 759. This analysis is sufficient.

### *Dr. Zangara*

Plaintiff also alleges the ALJ erred by failing to give Dr. Zangara's "assessments" the "weight [they] [were] due." (Doc. 17, at 11-12). With regard to the other neurologists of record, including Dr. Zangara, the ALJ noted that, "[n]one of the neurologists, Drs. Dirrenberger, Zangara, Loomus, or Ansevin, whom the claimant consulted since the date of cessation, offered any opinions in their treatment notes regarding the claimant's functional abilities, nor did the claimant's representative submit any medical source statements from these specialists." (Tr. 936).

Plaintiff does not rebut this statement by offering any evidence showing Dr. Zangara proffered a medical opinion at all. The record supports the ALJ's statement, as it contains treatment notes from neurological evaluations with Dr. Zangara in August 2009 and March 2010, and two letters Dr. Zangara wrote to Ms. Cogswell's primary care physician summarizing the evaluations. (Tr. 657-64, 684-96, 929). The ALJ was not required to give controlling weight to the physician's treatment notes or letters because they do not speak to Ms. Cogswell's functional limitations. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical

or mental restrictions."); *see also Montecalvo v. Comm'r of Soc. Sec.*, 695 F. App'x 124, 128 (6th Cir. 2017) ("In any event, the letters are not  medical opinions because they do not discuss functional limitations, *see* 20 C.F.R. § 404.1527(a)(2), and are therefore not entitled to deference by the ALJ, *see Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n.3 (6th Cir. 2009) (noting that statements that do not address the specific extent of limitations "appear to be outside the scope of 'medical opinions' as defined in 20 C.F.R. § 404.1527(a)(2)").").

And, even so, the ALJ noted that Dr. Zangara was unable to find a neurological injury, explanation, or diagnosis for Ms. Cogswell's symptoms, and thought they may be due to anxiety and, thus, recommended a psychiatric consultation. (Tr. 929). Plaintiff seems to argue that the ALJ should have adopted Dr. Zangara's "opinion" as to the etiology of Ms. Cogswell's systems because as a neurologist, Dr. Zangara "is the most qualified medical personnel on the record to identify something as caused by a mind-based psychological condition such as anxiety." (Doc. 17, at 11-12). Plaintiff adds that Dr. Zangara's specialty should "put weight on his assessment of etiology here as bolstering, not detracting from, the credibility of [Ms.] Cogswell's symptoms."[5] (Doc. 17, at 12).

These arguments are not well-taken. In letters to Ms. Cogswell's primary care physician, Dr. Zangara noted: 1) he could find no "neurologic diagnosis to provide aside from explaining the symptoms as an anxiety disorder." (Tr. 664); and 2) "I think her features are mostly anxiety induced and in this regard she may profit by a psychiatry consultation. I see no role for any further neurologic testing or need to return for re-evaluation." (Tr. 659). Dr. Zangara did determine the

---

5. To the extent Plaintiff is challenging the ALJ's credibility assessment, this argument is waived as underdeveloped. *McPherson v. Kelsey*, 125 F.3d at 995-96.

cause of Ms. Cogswell's symptoms, but rather ruled out a neurologic cause and suggested a psychiatric cause. Plaintiff has not shown the ALJ erred in his consideration of this evidence.

Record Review

Finally, Plaintiff asserts the ALJ erred by "improperly playing doctor and picking and choosing which elements in the record it was willing to really consider". (Doc. 17, at 13). However, Plaintiff fails to point to specific evidence the ALJ should have, but failed to, consider. *See Hollon ex rel. Hollon*, 447 F.3d at 491. The undersigned notes that Plaintiff, at all times, has the burden of showing disability. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) ("The burden is on the plaintiff to prove that [he] is disabled within the meaning of the regulations[.]").

Furthermore, this Court's power to review is limited to determining whether the ALJ's findings are supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

The undersigned finds the ALJ thoroughly evaluated the record evidence, and her decision is supported by substantial evidence in the record. Ultimately, while this case certainly is tragic, Plaintiff has failed to show the ALJ erred in her application of the law.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).